IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** LAEL ALEXANDER; | ) | |
| **(2)** URBAN EDGE NETWORK, INC.; | ) | |
| **(3)** SILO SECURED DATA, LLC.; and | ) | |
| **(4 )** NOITAVONNE, INC.; | ) | Case No.: 23-CV-00550-JFJ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **(5)** URBAN EDGE NETWORK, LLC.; | ) | |
| **(6)** HARDY PELT a/k/a VICTOR PELT; | ) | |
| **(7)** TODD BROWN; | ) | |
| **(8)** ROBERT CLAYTON; | ) | |
| and **(9)** GOLDSTEIN & MCCLINTOCK, | ) | |
| LLLP, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

**COME NOW** Plaintiffs Lael ALEXANDER (hereinafter "***ALEXANDER***"), Urban Edge

Network, Inc. ("***UEN CORP***"), Silo Secured Data, LLC ("***SILO***"); and NOITAVONNE, Inc.

("***NOITAVONNE***"); collectively "***PLAINTIFFS***") and for their Complaint against Defendants

Urban Edge Network, LLC ("***UEN LLC***"), Hardy PELT a/k/a Victor PELT ("***PELT***"), Todd

BROWN ("***BROWN***"), Robert CLAYTON ("***CLAYTON***"), and GOLDSTEIN & McClintock,

LLLP ("***GOLDSTEIN***") (collectively "***DEFENDANTS***") allege the following:

### **PARTIES**

1.     Plaintiff Lael ALEXANDER (hereinafter "***ALEXANDER***") is and at all pertinent

times was an individual who resides and at all pertinent times resided in the County of Tulsa, State

of Oklahoma.

1

2.      Plaintiff Urban Edge Network, Inc. ("***UEN CORP***") was a corporation formed under the laws of the State of Delaware with its principal place of business in the State of Texas. Based upon information and belief, UEN CORP was improperly dissolved as a corporation by Hardy PELT and Todd BROWN.  Based upon information and belief, as a result, UEN CORP is now a sole proprietorship owned by ALEXANDER.

3.      Plaintiff Silo Secured Data, LLC ("***SILO***") is a limited liability company formed under the laws of the State of Texas with its principal place of business in the State of Oklahoma.

4.      Plaintiff NOITAVONNE, Inc.  (" ***NOITAVONNE***") is a corporation formed under the laws of the State of Texas with its principal place of business in the State of Oklahoma.

5.      ALEXANDER is the majority shareholder/member in SILO, NOITAVONNE, and PERSONA.

6.      Defendant Urban Edge Network, LLC ("***UEN LLC***") is, upon information and belief, a limited liability company formed under the laws of the State of Nevada with its principal place of business in the State of Texas.

7.      Defendant Hardy PELT a/k/a Victor PELT ("***PELT***") is, upon information and belief, an individual who resides in the State of Texas.  Upon information and belief, PELT was and/or is a member of UEN LLC.

8.      Defendant Todd BROWN ("***BROWN***") is, upon information and belief, an individual who resides in the State of Texas.  Upon information and belief, BROWN was and/or is a member of UEN LLC.

9.      Defendant Robert CLAYTON ("***CLAYTON***") is, upon information and belief, an attorney who resides in the State of Maryland.

10.     Defendant GOLDSTEIN & McClintock, LLLP ("*GOLDSTEIN*") is, upon information and belief a law firm and a limited liability limited partnership formed under the laws of the State of Illinois with its principal place of business in State of Illinois and has offices in Washington, D.C.

## JURISDICTION AND VENUE

11.     This Court may exercise jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     This is a civil action arising under the laws of the United States.

13.     This action seeks relief and remedies for Defendants' violations of the Lanham Act, 15 U.S.C. § 1051 *et seq*., and for Defendants' violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

14.     Based on the foregoing, this Court may exercise subject-matter jurisdiction over this dispute.

15.     Venue is proper in this Judicial District.

16.     The acts of Defendants were directed at Plaintiffs while Plaintiffs were at all pertinent times residing, located, and/or doing business within this Judicial District.

17.     Venue is proper in this Judicial District also because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this Judicial District, and in the alternative, because at least one of the Defendants is subject to this Court's personal jurisdiction with respect to the instant action.

## FACTS

18.     ALEXANDER is an African-American inventor, designer, innovator, and entrepreneur in a variety of diverse industries.  ALEXANDER started his first business venture while pursuing his degree in Computer Science and Industrial Design at the University of New

3

Orleans.  He served honorably in the United States Navy.  Following his service in the Navy, he applied his skills in the oil & gas and telecom industries.  Over his diverse career, he has been the recipient of numerous awards, including the Telecom Industry Technology Entrepreneur of the Year Award in 2018, Techpreneur of the Year Award in 2017, and CES Innovation and Engineering Award in 2014 for his contributions to the mobile communications industry.  ALEXANDER has been described as a visionary electronic product designer who has pioneered breakthroughs and been a market disruptor.  He conceptualized cutting edge technologies such as "screen sharing" and played a pivotal role in the development of the U.S. Power Smart Grid. ALEXANDER has spent his professional career turning ideas into realities.

19.    In 2010, ALEXANDER founded NOITAVONNE, which later in 2011 was incorporated as NOITAVONNE, Inc. ("***NOITAVONNE***").    NOITAVONNE is a global manufacturer of high-quality, mobile hand-held devices, wireless solutions, and other products. Over the past fourteen years since founding the company, ALEXANDER has developed a manufacturing presence in multiple countries and has become the go-to consumer electronics design house and manufacturer for some of the world's premier brands.  Under ALEXANDER's leadership and innovative thinking, NOITAVONNE has an impressive track record of delivering tailored solutions to companies across diverse industries.  NOITAVONNE's services include engineering design, software development, product design, application programming, cloud security, consumer electronics, medical equipment, mobile devices, and more.  NOITAVONNE pushes technological boundaries and delivering cutting-edge solutions.

20.    In 2017, ALEXANDER created a web-based media platform owned by his company SILO.  SILO was expansion of ALEXANDER's services into the software realm. SiloCloud is a media platform within SILO with many useful user tools and applications.  Among

other many useful tools, Silo Cloud allows users to stream content. One of the primary purposes of the SiloCloud platform is to provide cloud-based application tools for individuals that will enable them to secure their information in private clouds separate from other available public cloud services, where each end user had their own walled off "Silo" cloud. SiloCloud virtualized tools that would allow individual users to stream videos, as well as the ability to launch their own TV channel, website, metaverse, NFT token, and more. SiloCloud offers all end users this tool set.

21.    Persona Publications, LLC ("**PERSONA**") is a limited liability company formed under the laws of the State of Oklahoma with its principal place of business in the State of Oklahoma.

22.    Persona is a company owned and developed by ALEXANDER. Essentially, Persona is an online newspaper/media platform developed by ALEXANDER to support SILO streaming and HBCU League Pass. One of its news media is called HBCU Post. Persona also has the employees and production capabilities to film and produce sporting events.

23.    ALEXANDER's goal was to apply the tool set of SiloCloud to identifiable affinity groups. One of those initial affinity groups was Historically Black Colleges and Universities ("**HBCU**"). ALEXANDER wanted to create opportunities for HBCUs to be able to set up their own streaming capabilities through SiloCloud, which would allow for HBCUs to create their own TV stations (the college radio station of the past), and to publicize themselves to their alumni and the public. One of the initial steps that ALEXANDER took was to create an avenue for HBCUs to stream sporting events via SiloCloud. With a device and access to the internet, individuals anywhere in the country/world would be able to access these HBCU sporting events via SiloCloud.

24.    ALEXANDER has extensive experience in the development of streaming media platforms, and is one of few people with the technical knowledge and capability to create such streaming platforms and deliver their functionality to consumers.

25.    In early 2020, ALEXANDER came up with the name "HBCU League Pass" as a streaming service for these sporting events for HBCU athletic conferences.  In order for HBCU League Pass to become more than a possibility, ALEXANDER began working over the next year to turn his original concept into a reality by developing the streaming technology.  ALEXANDER and NOITAVONNE invested significant amounts of time and capital into purchasing equipment to build the network of equipment necessary for TV and internet streaming, purchased servers, and worked on transcoding software (technology that converts live feeds to be enabled on a phone or app).  ALEXANDER and NOITAVONNE rented space and built out a studio in order to launch the TV channel/streaming service known as HBCU League Pass.  This was all done with the purpose of doing Beta testing during the 2021-2022 academic year for HBCUs.  One of ALEXANDER's visions was to teach the students at HBCUs how to manage the streaming services at the schools utilizing HBCU League Pass with SiloCloud.  Persona was going to be a resource for HBCUs that could provide the filming and production capabilities to allow the games to be produced and streamed to end users of HBCU League Pass.

26.    Long after his development of SiloCloud and after spending a year developing the technology behind HBCU League Pass, ALEXANDER began putting teasers online about the HBCU streaming idea.

27.    On or about February 5, 2021, ALEXANDER registered the following website domain names:

"urbanedgenetwork.com"

6

"urbanedgenetworks.com".

28.     In early February 2021, ALEXANDER registered the following additional website domain names:

>hbcupost.com, hbculeaguepass.com, hbcustreams.com, hbculeaguepass,
>
>hbcucloud, hbcusportsnetwork.com, hbcusportsnetworks.com,
>
>urbanedgenetworks.com, urbanedgenetwork.com, siacsportsnetwrok.com.

29.     ALEXANDER developed the logo for HBCU league pass.

30.     ALEXANDER also developed a related concept called HBCU Post, which was an online streaming newspaper owned by Persona.

31.     In early 2021, after putting the teasers out online about HBCU League Pass, ALEXANDER was contacted by an individual named Hardy PELT.  ALEXANDER had limited interaction with PELT several years before, but had never worked with PELT and knew little about PELT. PELT claimed to be presently working with HBCUs and assisting in their relationships with companies such as Coca-Cola.

32.     After this initial 2021 contact between ALEXANDER and PELT, ALEXANDER began having discussions with PELT about the possibility of marketing HBCU League Pass. PELT continued to promote himself as a person who had a significant background in promoting sporting events for HBCU conferences which included obtaining sponsorships and/or advertising for such broadcasts.[1]  Based on PELT's representations, ALEXANDER became convinced that

---

[1] ALEXANDER was wholly unaware that PELT, individually, and a company owned by PELT, New Vision Sports Properties, LLC, had been defendants in a lawsuit involving PELT's fraudulent efforts to promote and sell advertising relating to the broadcasting of HBCU sporting events, which resulted in a judgment against PELT and New Vision Sports in Maryland.  The judgment amount against PELT individually was $611,800.00 based on "intentional misrepresentation," for which he was jointly and severally liable with New Vision Sports, plus the Court awarded punitive damages solely against PELT in the amount of $1,000,000.00.  In addition, the Court awarded

PELT could effectively market ALEXANDER's HBCU League Pass concept to HBCUs under the oversight of ALEXANDER and his vision for HBCU League Pass and the benefits it could bring to HBCUs.

33.     PELT introduced ALEXANDER to Todd BROWN.  PELT represented that BROWN had operated a successful streaming service in the past and maintained those contacts that would benefit HBCU League Pass.  BROWN made similar representations as to the benefits he could bring to HBCU League Pass and the streaming of HBCU sporting events.  Thereafter, the three men, ALEXANDER, PELT, and BROWN, began discussing the possibility of furthering ALEXANDER's HBCU League Pass streaming service.  PELT and BROWN represented that they could market lucrative sponsorships and marketing opportunities for HBCU League Pass.

34.     Thereafter, ALEXANDER began discussing with PELT and BROWN that ALEXANDER was willing to form a business for the purpose *inter alia* of furthering the marketing of HBCU League Pass.  The discussions included using the name that ALEXANDER had already created, Urban Edge Network, and forming a marketing company to market ALEXANDER's vision and concept of HBCU League Pass.  Similar to other entities ALEXANDER envisioned to further the uses of SILO, it was ALEXANDER's plan that he would own 100% percent of the marketing entity to be named Urban Edge Network, as he and/or his related entities would provide use, but not ownership, of certain trade names, logos, trademarks, technical knowledge, ideas, and resources to be provided to Urban Edge Network to successfully market HBCU League Pass as envisioned by ALEXANDER.  Urban Edge Network would be authorized to use such assets, which would remain ALEXANDER's property.

_____

damages against New Vision Sports, which was solely owned by PELT, in the amount $1,507,838.31 for breach of the parties' written agreement and an additional $345,505.92 for breach of their oral agreement.

35.    Thereafter, on February 8, 2021, UEN CORP was formed and chartered as a Delaware corporation through the facilitation of Defendants, who did so as ALEXANDER's agent, working with Harvard Business Services, Inc.  UEN CORP was authorized to issue 10,000,000 shares with a par value of $0.0001000 per share, and was to have a perpetual existence unless otherwise decided by a majority of the Board.  There were also initial bylaws provided to UEN CORP as part of the formation process.

36.    NOITAVONNE, SILO, and ALEXANDER formed a joint venture to develop, market and stream HBCU League Pass to end users.  UEN CORP later joined the joint venture to market HBCU League Pass.  Each entity uniquely contributed to the joint venture as set forth in this Complaint.

37.    UEN CORP has been described in pleadings filed by PELT and BROWN on behalf of UEN CORP as "an African-American-owned and operated company that specializes in marketing, advertising, broadcasting, programming, and promotional activities for companies that want to partner with and support Historically Black Colleges and Universities ("HBCU")".  *See UEN CORP v. Webber Marketing and Consulting, LLC et al.* N.D. Tex. Case No. 3:22-CV-02021.

38.    The initial Board of Directors for UEN CORP included PELT, BROWN, and ALEXANDER, and these initial Directors were identified on the paperwork provided by Harvard Business Services.  ALEXANDER allowed PELT and BROWN to form UEN CORP with the instructions that ALEXANDER would be the sole owner of UEN CORP.  ALEXANDER agreed that if PELT and BROWN were successful in marketing HBCU League Pass thru UEN CORP, he would share a percentage of profits of UEN CORP with them.  PELT and BROWN agreed, expressly and/or impliedly, to ALEXANDER having sole ownership of UEN CORP.

39.    On February 24, 2021, PELT emailed ALEXANDER's assistant, Elizabeth Gafney, the following information in relation to UEN CORP:

> Hardy L. PELT – Founding Member/Chief Revenue Officer
>
> Todd F. BROWN – Co-Founder/Chief Executive Officer
>
> Lael A. ALEXANDER – Co-Founder/Chief Technology Officer
>
> Robert L. CLAYTON – General Counsel[2]
>
> Lavaille Lavette – Marketing Strategies.

40.    At the time of UEN CORP's formation ALEXANDER had already registered and obtained the rights for the website domain name "urbanedgenetworks.com" which was later used as UEN CORP's website.  This domain name was also used for email accounts  housed on servers owned by NOITAVONNE.

41.    Both PELT and BROWN were provided email accounts by ALEXANDER using the urbanedgenetworks.com domain name: hardy@urbanedgenetworks.com and todd@urbanedgenetworks.com.   When additional email accounts became necessary, PELT requested that ALEXANDER create such accounts utilizing the urbanedgenetworks domain.  In April of 2021, PELT, using his UEN CORP email account, requested that ALEXANDER create an additional UEN CORP email address, Cert4UEN@urbanedgenetwork.com, which would be used while seeking a Minority Business Enterprise ("**MBE**") certification.

42.    To ALEXANDER's knowledge in February of 2021, no written shareholder agreement was executed and no stock certificates were issued.  ALEXANDER was provided

---

[2] CLAYTON is an attorney that was introduced to ALEXANDER by PELT and BROWN, who encouraged ALEXANDER to use the services of CLAYTON.  CLAYTON acted in more than a general counsel role, taking an active role in drafting press releases and communicating on other avenues of publicity for UEN CORP and its streaming service HBCU League Pass.

information from PELT and BROWN that he was a member of the Board of Directors for UEN CORP. ALEXANDER did not receive any further documentation as to the corporate structure of UEN CORP and was focused on continuing his development efforts for HBCU League Pass and preparing for the fall of 2021 Beta testing. ALEXANDER authorized the use of his tradenames, domain names, and trademarks, and provided all the technical knowledge necessary for marketing HBCU League Pass through UEN CORP.

43.    ALEXANDER did not receive any notice announcing that action was going to be taken by the Board of Directors to document or allocate ownership of UEN CORP. ALEXANDER believed that PELT and BROWN were out marketing and promoting HBCU League Pass through their positions at UEN CORP to help facilitate a successful Beta test.

44.    In the summer of 2021, PELT, on behalf of UEN CORP, enlisted the services of Kelvin Boston for purposes of developing a phone application for HBCU League Pass. ALEXANDER was aware of these efforts, but thought they were unnecessary based on the technology he had developed to support HBCU League Pass. Likewise, in the summer of 2021, PELT, on behalf of UEN CORP, enlisted the services of CloLeeta A. Simpson to assist in obtaining UEN CORP's MBE certification.

45.    Between February of 2021 and July of 2021, UEN CORP utilized the services of ALEXANDER's and/or NOITAVONNE's employees for a variety of purposes, including the development of the phone app. PELT used this as an avenue to gain access to ALEXANDER's programmers who were working for SILO and NOITAVONNE, representing that he needed to make such contacts to further the efforts of marketing the HBCU League Pass.

46.     PELT and BROWN held themselves out as agents and/or representatives of UEN CORP to third parties for various purposes.  PELT's signature block attached to his UEN CORP email account identified himself as follows:

> Hardy L. Pelt
> Co-Founder/Chief Revenue Officer
> 702.752.7311 ph
> hardy@urbanedgenetworks.com
> www.hbculeaguepass.com
> www.urbanedgenetworks.com

While BROWN would often use another email account, todd@1619.capital, he used the following signature block on that email account:

> Todd F. Brown, PMP
> Co-Founder, Urban Edge Networks
> 323.481.4598
> www.hbculeaguepass.com

47.     UEN CORP also began branding efforts for the company, which included the development of a logo. ALEXANDER was involved in the design of the logo for UEN CORP.

48.     On July 16, 2021, ALEXANDER expressly asked of PELT to see the corporate documents for UEN CORP, noting that he had not been provided access to the documents.

49.     On July 16, 2021, PELT indicated that the corporate documents had been sent to ALEXANDER when the company was created in February of 2021, and that PELT would resend those same documents to ALEXANDER.

50.     Unbeknownst to ALEXANDER, as early as June of 2021 PELT, in concert with BROWN and CLAYTON, had been working behind the scenes and without ALEXANDER's knowledge or consent to prepare corporate documents to allocate the ownership of UEN CORP, including stock certificates and a restricted stock purchase agreement, between themselves,

meaning PELT, BROWN, and CLAYTON,[3] all to the exclusion of ALEXANDER and without disclosing these activities to ALEXANDER.  On information and belief, PELT purposefully concealed this information from ALEXANDER in July of 2021 when ALEXANDER expressly asked PELT to speak with PELT's colleagues and to see the corporate documents for UEN CORP, despite PELT knowing fully that he was conspiring with BROWN and CLAYTON to take UEN CORP for themselves.

51.    PELT purposefully and deliberately concealed the fact that he was in discussions with BROWN and CLAYTON the month prior about allocating all the stock of UEN CORP to the three of them to the exclusion of ALEXANDER, and that documents to consummate the allocation of UEN CORP shares had been prepared by CLAYTON and other attorneys at GOLDSTEIN and had been circulated between PELT, BROWN, CLAYTON, and GOLDSTEIN during June of 2021.

52.    With respect to the 10,000,000 shares of the par value stock authorized at the time of incorporation in February of 2021, a stock agreement was drafted that would provide BROWN with 4,800,000 shares in exchange for a purchase prices of $480.00; PELT with 4,800,000 shares in exchange for a purchase prices of $480.00; and CLAYTON with 400,000 shares in exchange for a purchase prices of $40.00.

53.    Despite being recognized at the time of incorporation as a cofounder of UEN CORP and a member of the Board of Directors, ALEXANDER was allocated zero shares of stock in UEN CORP and was never afforded an opportunity to vote on the allocation of shares in UEN CORP.

---

[3] In addition to being counsel for UEN CORP, CLAYTON and GOLDSTEIN provided legal services to ALEXANDER and NOITAVONNE.  CLAYTON and GOLDSTEIN knew, or should have known, that their actions to exclude ALEXANDER from UEN CORP violated the duties owed by CLAYTON and GOLDSTEIN to UEN CORP, ALEXANDER, and NOITAVONNE.

In fact, ALEXANDER had no knowledge of such activities on the part of PELT, BROWN, CLAYTON, and GOLDSTEIN.

54.    In June of 2021, further action was taken by BROWN, PELT, and CLAYTON acting in concert with one another and to the exclusion of ALEXANDER, wherein the following officer positions were filled without a meeting of the Board of Directors, of which ALEXANDER was a member:

| | |
|---|---|
| Chief Executive Officer | Todd F. Brown |
| President | Hardy L. Pelt |
| Chief Revenue Officer | Hardy L. Pelt |
| Secretary | Robert L. Clayton |

55.    On information and belief, the purported allocation of stock and appointment of officers occurred as the result of an action of the Board of Directors for UEN CORP, yet no notice of any Board meeting for that purpose was provided to ALEXANDER, nor is it believed that any such meeting was properly scheduled, commenced, held, or noticed as required by law.

56.    Upon information and belief, CLAYTON used his status as lawyer for UEN CORP, ALEXANDER, and NOITAVONNE to procure an ownership interest in the corporation.  In furtherance of the scheme and in concert with PELT and BROWN, CLAYTON used his position with the GOLDSTEIN Firm to prepare or have prepared  documents purporting to effectuate the allocation of ownership in UEN CORP, which included an allocation to CLAYTON himself, and to have himself appointed as the corporate secretary, all without the knowledge or approval of ALEXANDER.

57.    Without ALEXANDER's knowledge, CLAYTON worked with one of the other GOLDSTEIN lawyers, Yankun Guo, in preparation of the documents to effectuate the stock

allocation and other documents to finalize officer elections.  At all pertinent times, CLAYTON and Guo were employed by GOLDSTEIN and acted within the scope of their employment.

58.    In June of 2021, when the purported allocation of shares was being made and concealed from ALEXANDER, an inquiry was made as to whether there was something in writing demonstrating that ALEXANDER had resigned as a member of the UEN CORP board of directors. ALEXANDER never received any inquiry from PELT, BROWN, CLAYTON or GOLDSTEIN about a request for him to resign nor was he advised that certain actions were taken which required approval of the Board of Directors, such as stock allocation and election of officers.  Upon information and belief, PELT, BROWN, CLAYTON, and GOLDSTEIN, acting in concert, concealed these facts from ALEXANDER.  ALEXANDER did not resign from any office or position with UEN CORP, including membership on the Board of Directors, nor did ALEXANDER waive, surrender, or transfer his ownership interest in UEN CORP.  It is further believed that PELT and BROWN misrepresented to others and/or concealed the following from ALEXANDER and others: 1) that ALEXANDER had not in fact resigned as a member of the Board of Directors of UEN CORP; 2) that ALEXANDER was wholly unaware of an effort of any kind to remove him as a director and owner of UEN CORP; and 3) that PELT and BROWN had requested and/or assisted in the drafting of documents that falsely reflected a resignation by ALEXANDER from the Board.

59.    Both PELT and BROWN began using email accounts that accompanied the urbanedgenetworks.com domain.  ALEXANDER created and maintained those email accounts and the domain names on servers owned and/or controlled by ALEXANDER and/or by businesses owned and/or controlled by ALEXANDER.

60.     After close to a year of working with ALEXANDER, gaining his trust, and gaining access to ALEXANDER's, NOITAVONNE's, SILO's, and Persona's confidential and proprietary business information, documents, technology, as well as other tangible and intangible property belonging to Plaintiffs (including information relating to the streaming platform and HBCU League Pass), on or about February 28, 2022, BROWN and PELT registered a limited liability company with the Nevada Secretary of State with the name of Urban Edge Network, LLC ("UEN LLC").  BROWN and PELT were both listed as Managers of UEN LLC with the Nevada Secretary of State.  At the time UEN LLC was established, PELT and BROWN were still serving as officers and directors of UEN CORP.  In fact, BROWN did not resign his position with UEN CORP until sometime in April of 2022 when he texted ALEXANDER the following:  **"Hello, please take my name and resume off from any sites you own"** wherein he identified the urbanedgenetworks.com website indicating that the removal should be from "This site please."  In response, ALEXANDER inquired as follows:  "You mean you are no longer the CEO…." To which BROWN responded that he was **"No longer affiliated with your [meaning ALEXANDER's] company [UEN CORP],"** thus acknowledging that UEN CORP was ALEXANDER's company and not BROWN's or PELT's company.  ALEXANDER requested that BROWN provide this resignation in writing while ALEXANDER attempted to clean up and correct the mess that BROWN and PELT had made.  Instead of submitting a written resignation, BROWN emailed a screenshot of the text exchange to ALEXANDER on April 21, 2022.  This email came from BROWN through his 1619.capital email account, yet had the following signature block:

Todd F. Brown
Co-Founder/ CEO
Todd@urbanedgenetwork.net
323.481.4598(c)
www.urbanedgenetwork.net
www.hbculeaguepassplus.com

BROWN's email address on the signature block was now Todd@urbanedgenetwork.net.

61.    PELT was copied on the foregoing April 21, 2022 email from BROWN to

ALEXANDER, and PELT's email address, like BROWN's, was now using "**.net**" instead of

"**.com**," hardy@urbanedgenetwork.net:

From: **todd brown** <todd@1619.capital>
Date: Thu, Apr 21, 2022, 5:41 PM
Subject: Thx
To: <Laelalexander@gmail.com>
Cc: Hardy Pelt <hardy@urbanedgenetwork.net>

62.    Upon information and belief, UEN LLC is in the same business as UEN CORP,

and after it was established, UEN LLC, through BROWN and PELT, began using tangible and

intangible property belonging to ALEXANDER or UEN CORP for the benefit of UEN LLC and

to the exclusion of UEN CORP and to the detriment of ALEXANDER, NOITAVONNE, and

SILO.

63.    PELT and BROWN, in an effort to compete unfairly in the marketplace, set up a

confusingly similar website domain name for UEN LLC, which is www.urbanedgenetworks.net.

The only difference being that it was "**.net**" and not "**.com**," as was the domain registered well

over a year before by ALEXANDER, which has been maintained continuously to this date by

ALEXANDER.

64.    UEN LLC also began using the same logo developed by ALEXANDER for UEN

CORP and paid for by NOITAVONNE.   UEN CORP's logo is as follows:



UEN CORP's logo was designed by ALEXANDER as part of his contributions to the startup of

UEN CORP.  ALEXANDER loaned this mark to UEN CORP but retained ownership of the

mark.  UEN LLC's logo is confusingly similar (see below).



UEN LLC's unauthorized use of the logo shown immediately above is another example of the efforts by PELT, BROWN, and UEN LLC to compete unfairly in the marketplace, and to deprive ALEXANDER of his property.

65.     Upon information and belief, the GOLDSTEIN firm and CLAYTON knowingly and wrongfully facilitated not only the corporate documents that purportedly excluded ALEXANDER from his ownership interest in UEN CORP, but also played a significant role in the establishment of UEN LLC.  For a period of time, GOLDSTEIN and CLAYTON represented both UEN CORP and UEN LLC, despite the fact that the businesses of the two entities were in direct competition with one another, and thereby facilitated the transfer of property belonging to ALEXANDER or UEN CORP to UEN LLC.  In fact, GOLDSTEIN and CLAYTON knowingly and wrongfully continued legal representation of both UEN CORP and UEN LLC for a period of months until GOLDSTEIN and CLAYTON acknowledged that the interests of UEN LLC and UEN CORP were in direct conflict.

66.     In 2022, after assisting PELT and BROWN in their deception of ALEXANDER, which included assisting in the development of UEN LLC and representing UEN LLC, GOLDSTEIN and CLAYTON advised PELT and BROWN that UEN CORP and UEN LLC needed to engage separate counsel as there was an issue with GOLDSTEIN and CLAYTON continuing to represent both entities.  GOLDSTEIN and CLAYTON further advised that to the extent there was a conflict between PELT, BROWN, and ALEXANDER, separate counsel should be engaged by each of these individuals.

67.     In the fall of 2021, ALEXANDER's plan was to broadcast a limited number of HBCU football games as a Beta testing project for HBCU League Pass.  As part of this Beta testing, individuals were able to view the games being streamed without charge.

68.     ALEXANDER planned to make HBCU League Pass a subscription-based service where end users would pay a fee for access to the streaming of the media provided by HBCU League Pass.

69.     Unknown to ALEXANDER, PELT and BROWN were selling advertising for the games being streamed during this Beta testing process on HBCU League Pass, and did so through either or both UEN CORP and UEN LLC.  ALEXANDER was aware that advertising was included as part of the Beta testing broadcasts, but was wholly unaware that UEN CORP, PELT, and/or BROWN were being paid by any such sponsors, as it was ALEXANDER's understanding that the sponsors were providing advertising content without charge to UEN CORP to make sure that such pre-recorded advertisements were functioning as part of the Beta testing.  To this day, ALEXANDER has never been provided with any financial statements for UEN CORP, and does not know the extent of any such financial gain received by UEN CORP, PELT, BROWN, or CLAYTON in connection with such sponsorships.  ALEXANDER received merely anecdotal information about possible advertising sales just a few days prior to December 25 of 2021 and later in the spring of 2022 about certain advertising dollars  that may have been earned by UEN CORP without the knowledge or authority of ALEXANDER.  Based upon information and belief, despite the streaming of the games being on ALEXANDER's SILO platform and through his HBCU League Pass, all or some of the proceeds collected by PELT and BROWN as part of the advertising efforts were directed to either PELT and BROWN individually or to companies selected by them.

70.     Following the end of the 2021-2022 school year, ALEXANDER concluded the Beta testing.

71.    Thereafter, upon information and belief, PELT and BROWN enlisted the services of programmers to create a cloned version of the technology from both SILO and the HBCU League Pass. The new streaming service was created to directly compete with and/or take the improperly take the place of HBCU League Pass. The new streaming service improperly created by PELT and BROWN was called HBCU League Pass Plus, but was later changed to HBCU Plus. Based upon information and belief, PELT and BROWN planned to stream games for HBCU and sell advertising in relation to games broadcasted on HBCU Plus.

72.    In June of 2023 it was announced by Urban Edge Network, LLC that it was rebranding its streaming platform, HBCU League Pass Plus, to HBCU+ effective immediately. The purpose of HBCU+ was to be a platform to stream and showcase sporting events and other activities for HBCU schools.

73.    In an article from ABNEWSWIRE posted on February 21, 2022, Todd BROWN was quoted as saying that "Urbanedgenetwork.net was created to transform the landscape in advertising for HBCUs. It is our goal to bring advertising dollars, Name-Image-Likeness (NIL) income, and streaming video enabled by AdTech to 101 historically black college and university communities, students, and alumni." This statement was made by BROWN with the knowledge that the urbanedgenetwork.net domain name was not the property of UEN LLC as UEN LLC had not yet been registered. The article went on to state that Stillman College had signed a multi-year agreement with UEN CORP for broadcasting sports on HBCU+.

74.    Upon information and belief, at some point after PELT and BROWN had conspired to misappropriate ALEXANDER's proprietary technology, they set up a new domain name – urbanedgenetworks.net – as the new website for UEN LLC.

75.    Using the name of UEN CORP and/or UEN LLC, it is believed that one or both entities procured marketing and advertising sales in relation to the broadcast of various sporting events on the SILO platform, yet did not provide or offer any of the financial benefits of their activities to NOITAVONNE, SILO, or ALEXANDER, who were intended beneficiaries of the revenues of streaming services to be marketed by UEN CORP.

76.    UEN CORP in a lawsuit filed on its behalf by PELT and BROWN, without knowledge or authority of ALEXANDER, in the United States District Court for the Northern District of Texas alleged the following:

a.    That UEN CORP is "an African-American-owned and operated company that specializes in marketing, advertising, broadcasting, programming, and promotional activities for companies that want to partner with and support Historically Black Colleges and Universities ('HBCU');"

b.    That UEN CORP "is a company that owns and operates an OTT channel and app dedicated to HBCU sports and has held meetings with buyers and brands from Pepsi, IPG, Dentsu, Publicis, Nike, and General Motors;"

c.    That UEN CORP's "senior management is made up of Todd Brown and Hardy Pelt;"

d.    That "Todd F. Brown is the Co-Founder and Chief Executive Officer of UEN [CORP];"

e.    That "Hady Pelt is Co-Founder and Chief Revenue Officer for UEN [CORP];"

f.    That on or about "December 31, 2021, UEN [CORP] entered into a written agreement with Peak Sports in the State of Texas to engage in national advertising, marketing, and broadcasting for SWAC members . . . [and] UEN [CORP] expected

to receive advertising revenues under this agreement of approximately four to five million dollars per year from its relationship with Peak Sports. . .;"

g.   That UEN CORP "entered into an oral agreement with General Motors to place advertising with UEN [CORP] which was estimated to generate several million dollars in advertising revenues annually;"

h.   That UEN CORP "entered into an oral agreement with PepsiCo through direct communications and negotiations with Christina Tyson, Director [of] Supplier Diversity [and] Global Procurement, located in Dallas, Texas.  PepsiCo agreed to start advertising during HBCU games on UEN [CORP]'s streaming channel . . . Based on negotiations between the parties, UEN [CORP] expected to be a significant part of PepsiCo's growth initiatives;"

i.   That UEN CORP's "agreement with PepsiCO included an upfront commitment of advertising dollars with indications that the commitment would be significantly increased if the advertising proved successful.  UEN [CORP] expected to derive millions of dollars of revenues from its contractual relationship with Pepsico;"

77.   No such revenues have been disclosed to ALEXANDER. It is believed that revenues belonging to Plaintiffs were surreptitiously diverted by PELT and BROWN to UEN LLC in an effort to fraudulently, wrongfully, and maliciously divert such monies away from Plaintiffs.

**FIRST CLAIM**
**BREACH OF FIDUCIARY DUTY**

78.   Plaintiffs re-allege and incorporate all allegations set forth above.

79.   PELT and BROWN as both officers and directors of UEN CORP owed fiduciary duties or obligations, including without limitation, a duty or obligation to act at all times with the utmost good faith, loyalty, honesty, and fair dealing towards UEN CORP and ALEXANDER, to

23

avoid self-dealing, conflicts of interest and acting for their personal benefit to the exclusion of UEN CORP and ALEXANDER, and to act in the best interest of UEN CORP in all matters relating to its business.

80.     UEN CORP and ALEXANDER placed trust and confidence in PELT and BROWN that they would abide by their fiduciary duties and obligations.

81.     PELT and BROWN breached their fiduciary duty or obligation by concealing and failing to keep UEN CORP and ALEXANDER informed of all material facts affecting UEN CORP's and ALEXANDER's interests, namely their formation and operation of a competing company, their plans to compete against UEN CORP and ALEXANDER in the media streaming industry, and, upon information and belief, their diversion of property, income, and business from UEN CORP and ALEXANDER for the benefit of themselves while acting as officers, directors, and employees of UEN CORP.

82.     CLAYTON and GOLDSTEIN as attorneys for UEN CORP, NOITAVONNE, and ALEXANDER, owed fiduciary duties or obligations, including without limitation, a duty or obligation to act at all times with the utmost good faith, loyalty, honesty, and fair dealing towards UEN CORP, NOITAVONNE, and ALEXANDER, to avoid self-dealing, conflicts of interest and acting for their personal benefit to the exclusion of UEN CORP, NOITAVONNE, and ALEXANDER, and to act in the best interest of UEN CORP and ALEXANDER in all matters relating to UEN CORP's business, including property owned by ALEXANDER and being used by UEN CORP.

83.     UEN CORP, NOITAVONNE, and ALEXANDER placed trust and confidence in CLAYTON and GOLDSTEIN that they would abide by their fiduciary duties and obligations.

84.     CLAYTON and GOLDSTEIN, as counsel for UEN CORP and ALEXANDER , owed a fiduciary duty to UEN CORP and ALEXANDER to not facilitate or participate in the formation and representation of a competing business with UEN CORP to the detriment of Plaintiffs.

85.     CLAYTON and GOLDSTEIN breached their fiduciary duty by concealing and failing to keep UEN CORP and ALEXANDER informed of all material facts affecting UEN CORP's and ALEXANDER's interests, namely their participation in the formation or representation of a competing company, their participation in the plans for PELT, BROWN, and UEN LLC to compete against UEN CORP and ALEXANDER in the media streaming industry, and, upon information and belief, their participation in the diversion of business from UEN CORP and ALEXANDER for the benefit of themselves, PELT, BROWN, and UEN LLC while acting as counsel for UEN CORP, NOITAVONNE, and ALEXANDER.

86.     These breaches by PELT, BROWN, CLAYTON, and GOLDSTEIN were committed with a reckless disregard for the rights of Plaintiffs, or were done intentionally and with malice toward Plaintiffs, and were of such an aggravated character as to warrant the imposition of punitive damages.

87.     The foregoing wrongful and unlawful conduct has proximately caused and, unless restrained and enjoined, will continue to cause UEN CORP, NOITAVONNE, and ALEXANDER severe, immediate, and irreparable harm, damage and injury for which UEN CORP, NOITAVONNE, and ALEXANDER have no adequate remedy at law.

88.     As a result of the breaches of fiduciary duties by PELT, BROWN, CLAYTON, GOLDSTEIN, Plaintiffs have suffered harm for which they should be compensated in damages.

**SECOND CLAIM**
**FRAUD/DECEIT**

89.     Plaintiffs re-allege and incorporate all allegations set forth above.

90.     As set forth above, PELT and BROWN made material misrepresentations and/or failed to disclose certain material facts known to PELT and BROWN with the intention that Plaintiffs would rely on their representations or intentional omissions.

91.     Plaintiffs reasonably relied upon such representations not knowing such representations were false, and detrimentally changed their position in reliance upon PELT and BROWN.

92.     At the time PELT and BROWN made such representations to the Plaintiffs and/or failed to disclose material facts to Plaintiffs, PELT and BROWN knew the representations were false and/or knew they had wrongfully concealed and failed to disclose such material facts to Plaintiffs.

93.     PELT and BROWN acted willfully and wantonly and with fraudulent design, malice, and utter disregard for the rights of the Plaintiffs.  Their fraud/deceit justifies the imposition of punitive damages.

94.     CLAYTON and GOLDSTEIN also defrauded Plaintiffs by concealing from Plaintiffs the fraud and other misconduct of PELT and BROWN, and by aiding PELT and BROWN in deceiving and stealing from Plaintiffs.   As attorneys representing Plaintiffs, CLAYTON and GOLDSTEIN had a duty to disclose to Plaintiffs (1) the deceit being perpetrated by PELT and BROWN, (2) the ownership interested received by CLAYTON, and (3) the conflicts of interest and disloyalty that were implicated in the role of legal advisors that was undertaken by CLAYTON and GOLDSTEIN.

95.     CLAYTON and GOLDSTEIN maliciously or recklessly violated their professional duties to Plaintiffs, and their fraud justifies the imposition of punitive damages against them.

96.     As a result of the fraud perpetrated by PELT, BROWN, CLAYTON, and GOLDSTEIN, Plaintiffs have suffered harm for which they should be compensated in damages.

**THIRD CLAIM**
**BREACH OF IMPLIED CONTRACT/JOINT VENTURE**

97.     Plaintiffs re-allege and incorporate all allegations set forth above.

98.     In the alternative, in 2021 ALEXANDER entered into an oral contract or oral joint venture or into an implied-in-fact contract or implied-in-fact joint venture with PELT and BROWN, by which ALEXANDER, PELT, and BROWN agreed *inter alia* to form a company to be owned by ALEXANDER or, in the alternative, by the three of them.  It was agreed by them that the new company could use, but would not own, certain property of Plaintiffs for the business purposes described in this Complaint.  ALEXANDER has met, satisfied, and fulfilled all conditions precedent to obtaining enjoyment of the benefits and interests contractually promised to him and to exercising the rights granted to him in the contract or joint venture.

99.     PELT and BROWN breached the promises made by them in the oral contract or oral joint venture, or in the implied-in-fact contract or implied-in-fact joint venture, in that PELT and BROWN formed the new company but breached their promises to ALEXANDER by *inter alia* (1) excluding ALEXANDER from holding or exercising any ownership interest in the new company, (2) stealing and using to ALEXANDER's detriment certain property owned by ALEXANDER, and (3) committing the other acts of fraud, disloyalty, unfair competition, and tortious interference that are described in this Complaint.

100.     The terms of the oral contract or the oral joint venture, and the terms of the implied-in-fact contract or the implied-in-fact joint venture, included an implied covenant of good faith and fair dealing.  This implied covenant was breached by PELT and BROWN as described in this Complaint.

101.    As the direct and proximate result of the misconduct of BROWN and PELT, ALEXANDER has suffered harm for which he should be compensated in damages.

102.    In addition to awarding ALEXANDER damages, this Court should order specific performance of the contract or joint venture.

### FOURTH CLAIM
### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS

103.    Plaintiffs re-allege and incorporate all allegations set forth above.

104.    Plaintiffs had existing or prospective valid business relationships with various third parties, including HBCU member institutions and other companies in the broadcasting community.

105.    Defendants PELT and BROWN knew about these business relationships, and intentionally, wrongfully, and tortiously interfered with them by, among other things, disparaging Plaintiffs, soliciting Plaintiffs' business relationships, and wrongfully using Plaintiffs' trade secrets and confidential and proprietary information against Plaintiffs to interfere with Plaintiffs' business relationships, wrongfully using Plaintiffs' intellectual property, and using deception, concealment, and misrepresentation to create and sustain the interference.

106.    PELT's and BROWN's actions were malicious and intentional, and they were carried out with improper motives and using improper means, pursuant to PELT's and BROWN's unfair competition against Plaintiffs.

107.    As a direct result of PELT's and BROWN's interference, Plaintiffs have suffered loss of valuable business relationships, including advertisers and others in the broadcast industry. Plaintiffs believe that without intervention by this Court, they will continue to lose these business relationships and suffer other financial and reputational harm.

108.    PELT's and BROWN's tortious interference with Plaintiffs' business relations was committed with a reckless disregard for the rights of Plaintiffs, or was done intentionally and with malice towards Plaintiffs, and was of such an aggravated character as to warrant the imposition of punitive damages.

109.    The foregoing wrongful, unlawful, and tortious conduct has proximately caused and, unless restrained and enjoined, will continue to cause Plaintiffs severe, immediate, and irreparable harm, damage, and injury for which Plaintiffs have no adequate remedy at law.

110.    As a result of PELT's and BROWN's unlawful and tortious conduct, Plaintiffs have suffered harm, for which they should be compensated in damages.

**FIFTH CLAIM**
**CONVERSION/MISAPPROPRIATION OF BUSINESS INFORMATION**

111.    Plaintiffs re-allege and incorporate all allegations set forth above.

112.    Plaintiffs are the owners of their information systems, including their networks, coding, software, technology, programs, internet domains, servers, computer systems, all information, business or otherwise, created and/or stored on such systems, and all other property created or purchased by and/or in the possession of Plaintiffs.

113.    Plaintiffs are solely entitled to exclusive use and possession of their information systems, including their networks, coding, software, technology, programs, internet domains, servers, computer systems, all information, business or otherwise, created and/or stored on such systems, and all other property created or purchased by and/or in the possession of Plaintiffs.

114.    Upon information and belief, during PELT's and BROWN's affiliation with UEN CORP as officers, directors, and employees, they intentionally copied, transferred, cloned, duplicated, downloaded, or otherwise wrongfully procured and misappropriated Plaintiffs' confidential information and wrongfully took possession of Plaintiffs' documents, information,

information systems, and other tangible and intangible property for their benefit, and the benefit of their new company, UEN LLC, without permission and/or authorization from Plaintiffs, and to the exclusion and detriment of Plaintiffs.

115.    PELT and BROWN converted, and UEN LLC received, Plaintiffs' confidential business information and information systems pursuant to PELT's and BROWN's confidential relationship with UEN CORP as officers, directors, and/or employees of UEN CORP and/or as a result of other improper means, including theft and fraud.

116.    To the extent that PELT, BROWN, and UEN LLC converted Plaintiffs' intangible property, *i.e.* its confidential business information and intellectual property, they are liable to Plaintiffs for the tort of misappropriation of confidential business information and intellectual property.

117.    Upon information and belief, PELT and BROWN wrongfully transferred other assets and monies that were belonging or owing to UEN CORP and ALEXANDER for their own personal use and benefit or for the use and benefit of UEN LLC.

118.    PELT, BROWN, and UEN LLC's conversion and misappropriation of Plaintiffs' business information and information systems were committed with a reckless disregard for the rights of Plaintiffs, or were done intentionally and with malice towards Plaintiffs, and were of such an aggravated character as to warrant the imposition of punitive damages.

119.    The foregoing wrongful and unlawful conduct has proximately caused and, unless restrained and enjoined, will continue to cause Plaintiffs severe, immediate, and irreparable harm, damage, and injury for which Plaintiffs have no adequate remedy at law.

120.    As a result of the unlawful actions of PELT, BROWN and UEN LLC, Plaintiffs have suffered harm for which they should be compensated in damages.

**SIXTH CLAIM**
**NEGLIGENT MISREPRESENTATION**

121.    Plaintiffs re-allege and incorporate all allegations set forth above.

122.    PELT and BROWN negligently made material misrepresentations and/or negligently failed to disclose certain material facts known to PELT and BROWN.  Such negligent misrepresentations and omissions included the fact that they were working with CLAYTON and GOLDSTEIN to take ownership of UEN CORP to the exclusion of ALEXANDER and took information and property belonging to UEN CORP and other Plaintiffs and used the same for their own benefit.

123.    Plaintiffs reasonably relied upon such negligent representations,  not knowing such representations were false.  Plaintiffs detrimentally relied upon the negligent misrepresentations and omissions of PELT and BROWN.

124.    At the time PELT and BROWN made such negligent misrepresentations to Plaintiffs and/or failed to disclose material facts to Plaintiffs, PELT and BROWN knew that Plaintiffs would rely on the misrepresentations and omissions.

125.    As a result of the negligent actions of PELT and BROWN, Plaintiffs have suffered harm for which they should be compensated in damages.

**SEVENTH CLAIM**
**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**

126.    Plaintiffs re-allege and incorporate all allegations set forth above.

127.    As a result of the conduct described in this Complaint, PELT, BROWN and UEN LLC have been unjustly enriched at the expense of Plaintiffs.

128.    Defendants should be disgorged of all monies, profits, and gains of any kind which they have obtained or will unjustly obtain in the future at the expense of Plaintiffs, and a constructive trust should be imposed for the benefit of Plaintiffs.

129.    As a result of Defendants' unlawful actions, Plaintiffs have been damaged and Defendants should be disgorged of any monies, profits, and gains of any kind which they have obtained or will unjustly obtain in the future at the expense of Plaintiffs, and a constructive trust should be imposed for the benefit of Plaintiffs on any monies, profits, or other gains of any kind that are in the possession or under the control of Defendants.

**EIGHTH CLAIM**
**VIOLATION OF LANHAM ACT**

130.    Plaintiffs re-allege and incorporate all allegations set forth above.

131.    At all pertinent times, PELT and BROWN owned, controlled, managed, and operated UEN LLC, and did so with the intent and desire to deprive Plaintiffs of Plaintiffs' rights and property, and with the intent and desire to undermine and loot UEN CORP, all to their own benefit and to the detriment of Plaintiffs.

132.    ALEXANDER was and is the originator, first user, and owner of the trade names and trademarks UEN, Urban Edge, Urban Edge Network, Urban Edge Networks, HBCU League Pass, HBCU Post, urbanedgenetwork.com, urbanedgenetworks.com, and hbculeaguepass.com. In addition, ALEXANDER was and is the originator, first user, and owner of the trademarks and logos associated with the above tradenames and trademarks.

133.    Defendants used in interstate commerce the tradenames and trademarks owned by ALEXANDER that are identified above.

134.    Such usage by Defendants is likely to cause confusion, cause mistake, or deceive as to the affiliation, connection, or association of ALEXANDER with Defendants and entities that

Defendants own or control, and as to the origin, sponsorship, or approval of Defendants' goods or services by ALEXANDER.  Such confusion, mistake, and deception has occurred and, absent the entry of an injunction against Defendants, is likely to continue.

135.     As the result of such usage by Defendants, Plaintiffs have suffered, and continue to suffer, financial and reputational harm for which they should be compensated in damages.

136.     Defendants have engaged in such usage with a bad-faith intent to profit from ALEXANDER's trademarks, tradenames, and distinctive domain names, and have registered, trafficked in, or used domain names that are nearly identical or confusingly similar to ALEXANDER's trade names, trademarks, and distinctive domain names.

137.     As the result of the Defendants' bad-faith exploitation of ALEXANDER's distinctive marks and domain names, Plaintiffs have suffered harm for which they should be compensated in damages.

138.     Such exploitation by Defendants was done maliciously or recklessly, and the imposition of punitive damages is justified.

**NINTH CLAIM**
**DERIVATIVE CLAIM – ACCOUNTING**

139.     Plaintiffs re-allege and incorporate all allegations set forth above.

140.     Plaintiffs request that an accounting be ordered to determine the amount of money and other property that has been wrongfully distributed to and/or taken by PELT and BROWN.

141.     Plaintiffs also request the Court enforce a full and complete account of UEN LLC, from its inception, and/or UEN CORP, from its inception, to determine the rights of the parties related to UEN LLC's and/or UEN CORP's earnings, income, profits, expenses, distributions, assets, liabilities, and financial condition.

**TENTH CLAIM**

**BREACH OF DUTY OF LOYALTY AND EQUITABLE DISGORGEMENT**

142.    Plaintiffs re-allege and incorporate all allegations set forth above.

143.    As officers, directors, and/or employees of UEN CORP, PELT and BROWN owed to UEN CORP a duty of loyalty.

144.    Such duty included the duty to not compete with UEN CORP while serving as an officer, director, and/or employee of UEN CORP, the duty not to solicit UEN CORP's customers, clients, or other business relationships while in such capacity with UEN CORP, and the duty not to steal or misappropriate UEN CORP's confidential and proprietary information, trade secrets, and intellectual property.

145.    PELT and BROWN breached their duty of loyalty while serving as officers, directors, and/or employees of UEN CORP.

146.    PELT and BROWN breached their duty of loyalty in an attempt to disrupt, dismantle, and destroy UEN CORP's business and goodwill in order that PELT and BROWN could steal UEN CORP's customers, clients, property, and confidential and proprietary information.

147.    Upon information and belief, PELT and BROWN spent considerable time during their time as officers, directors, and/or employees of UEN CORP, planning and scheming to undermine UEN CORP and UEN CORP's business.

148.    The actions of PELT and BROWN were the proximate cause of UEN CORP's damages.

149.    The actions of PELT and BROWN were committed with reckless disregard for the rights of Plaintiffs, or were done intentionally and with malice towards Plaintiffs, and were of such

an aggravated character as to warrant the imposition of punitive damages and/or exemplary damages.

150.    As a result of PELT's and BROWN's breaches and other unlawful actions, UEN CORP has been Plaintiffs have suffered harm for which they should be compensated in damages, and PELT and BROWN should be disgorged of any monies paid to them during the period when they committed their breaches.

**ELEVENTH CLAIM**
**MISAPPROPRIATION OF TRADE SECRETS/**
**VIOLATION OF DEFEND TRADE SECRETS ACT**

151.    Plaintiffs re-allege and incorporate all allegations set forth above.

152.    Plaintiffs' confidential information constitutes trade secrets as defined in the Defend Trade Secrets Act of 2016.  Plaintiffs took reasonable steps to protect the secrecy of said information, which was not generally available to or readily accessible by the public and which had independent economic value by reason of not being generally available to or accessible by Plaintiffs' competitors.

153.    Plaintiffs' trade secrets were and are related to a product or service used in, or intended for use in, interstate commerce, in that the HBCUs, their alumni, and their sports fans are located throughout the United States.

154.    PELT and BROWN had access to Plaintiffs' trade secrets as part of their relationships with UEN CORP and the other Plaintiffs.

155.    PELT and BROWN acknowledged that such information was confidential, by requiring third parties who were involved in Plaintiffs' projects to sign non-disclosure agreements. PELT and BROWN knew that during their employment or while serving as officers or directors of UEN CORP, and upon leaving their positions as officers, directors, and/or employees of UEN

CORP, all records, reports, notes, compilations, or other recorded or documented matter, including copies thereof, belonged to and were property of UEN CORP or Plaintiffs, and that if they were to engage in a competing activity, they were not permitted to divulge or use Plaintiffs' trade secrets.

156.    Upon information and belief, PELT and BROWN knowingly and in bad-faith misappropriated Plaintiffs' trade secrets during their service as officers, directors, and/or employees of UEN CORP and continued to do so after such service had ceased.    Such misappropriation in ongoing.

157.    Upon information and belief, Defendants have used Plaintiffs' trade secret information for their own pecuniary benefit and have disclosed Plaintiffs' trade secret information to third parties without Plaintiffs' consent, and will continue to do so.

158.    Plaintiffs are entitled to an injunction prohibiting Defendants' continuing and ongoing misappropriation, to prevent further wrongful use and disclosure of Plaintiffs' trade secrets.

159.    Defendants' continuing and ongoing actions are the actual and proximate cause of Plaintiffs' damages.

160.    Defendants' actions have been and continue to be willful and malicious, such that Plaintiffs are entitled to punitive damages in an amount to be determined by a jury, in order to insure that Defendants are punished for their misconduct and to serve as an example and deterrent to others similarly situated that may consider whether to engage in the same or similar misconduct.

161.    As the result of Defendants' misappropriation of trade secrets, Plaintiffs have suffered harm for they should be compensated in damages.

## TWELFTH CLAIM
## UNFAIR COMPETITION

162.    Plaintiffs re-allege and incorporate all allegations set forth above.

163.    PELT, BROWN, and UEN LLC have competed unfairly with Plaintiffs by using Plaintiffs' trade secrets, intellectual property, money, confidential and proprietary information, technology, documents, and information gained through PELT's and BROWN's position as officers, directors, and employees of UEN CORP, and by engaging in deceptive acts to conceal and misappropriate Plaintiffs' property.  PELT, BROWN, and UEN LLC have gained an unfair and unlawful competitive advantage against Plaintiffs as a result.  UEN LLC accepted the fruits of this unfair competition with knowledge that PELT and BROWN had used and improperly procured the confidential and proprietary information, trade secrets, intellectual property, technology, documents, and information belonging to Plaintiffs.  PELT, BROWN, and UEN LLC have used and will continue to used Plaintiffs' property with an intent to compete unfairly with and cause injury to Plaintiffs.

164.    This unfair competition was committed with a reckless disregard for the rights of Plaintiffs, or was done intentionally and with malice towards Plaintiffs, and was of such an aggravated character as to warrant the imposition of punitive damages.

165.    The foregoing wrongful and unlawful conduct has proximately caused and, unless restrained and enjoined, will continue to cause Plaintiffs severe, immediate, and irreparable harm, damage, and injury for which Plaintiffs have no adequate remedy at law.

166.    As a result of the unlawful actions of PELT, BROWN and UEN LLC, Plaintiffs have suffered harm for which they should be compensated in damages.

## THIRTEENTH CLAIM
## AIDING AND ABETTING

167.    Plaintiffs re-allege and incorporate all allegations set forth above.

168.    Defendants knew of PELT's and BROWN's conduct that breached fiduciary duties and obligations, breached duties and obligations of loyalty, and other duties owed to Plaintiffs, and

Defendants knowingly and intentionally gave substantial assistance or encouragement to PELT and BROWN to so conduct themselves.

169.    Further, Defendants either aided and abetted the aforesaid wrongful actions or ratified PELT's and BROWN's wrongful actions after they had committed those wrongful actions.

170.    CLAYTON and GOLDSTEIN knew of PELT's and BROWN's conduct that breached fiduciary duties and obligations, breached duties and obligations of loyalty, and other duties owed to Plaintiffs, and CLAYTON and GOLDSTEIN knowingly and intentionally gave substantial assistance or encouragement to PELT and BROWN to so conduct themselves.

171.    CLAYTON and GOLDSTEIN either aided and abetted the aforesaid wrongful actions or ratified PELT's and BROWN's wrongful actions after they had committed those wrongful actions.

172.    As the result of Defendants' unlawful actions in aiding and abetting the aforesaid wrongful conduct, Plaintiffs have suffered harm for which they should be compensated in damages.

## FOURTEENTH CLAIM
## PROFESSIONAL NEGLIGENCE

173.    Plaintiffs re-allege and incorporate all allegations set forth above.

174.    GOLDSTEIN and CLAYTON owed UEN CORP, NOTIAVONNE and ALEXANDER a duty to provide competent representation utilizing legal knowledge, skill, thoroughness, and communication.

175.    GOLDSTEIN and CLAYTON breached their duty to UEN CORP, NOTIAVONNE and ALEXANDER by failing to comply with their ethical obligations and/or to possess or to utilize the legal knowledge, skill, thoroughness, efficiency, and preparation reasonably necessary for the representation and by failing to perform the contracted services in a

good, workman like and diligent fashion, exercising the level of care of qualified and experienced professionals engaging in similar work.

176.    GOLDSTEIN and CLAYTON owed UEN CORP, NOTIAVONNE and ALEXANDER a duty of loyalty and breached that duty by putting their own pecuniary interests ahead of the legal interests of UEN CORP, NOTIAVONNE and ALEXANDER.

177.    As a result of the breach of their duties, UEN CORP, NOTIAVONNE and ALEXANDER have suffered actual damage in an amount in excess of $75,000.00.

**FIFTEENTH CLAIM**
**INJUNCTIVE RELIEF**

178.    Plaintiffs re-allege and incorporate all allegations set forth above.

179.    Plaintiffs are likely to prevail on the merits of their claims, including those claims which entitle Plaintiffs to injunctive relief.

180.    The actions of Defendants have caused Plaintiffs to suffer irreparable harm, and Plaintiffs will continue to suffer irreparable harm if the conduct of Defendants is not restrained.

181.    Plaintiffs have been deprived of not only their property rights, but they have also been deprived of the benefit of their trade secrets, tradenames, trademarks, and confidential and proprietary information, which Plaintiffs spent significant resources and time to create and develop.  Defendants' unlawful possession and use of Plaintiffs' confidential and proprietary information causes substantial injury to Plaintiffs.  Indeed, Defendants' use of this confidential and proprietary information will provide Defendants' start-up company, UEN LLC, with an accelerated avenue to compete unfairly with Plaintiffs.

182.    PELT's and BROWN's intimate knowledge of Plaintiffs' confidential and proprietary information will give them and UEN LLC a significant unfair advantage in the marketplace, thus resulting in Plaintiffs' loss of customers and good will.  From this loss of

competitive advantage, Plaintiffs will lose a substantial amount of revenue.  This harm is difficult to quantify and cannot be remedied by an award of monetary damages.

183.    Defendants' tortious interference with Plaintiffs' business relationships wrongfully and unfairly diminishes Plaintiffs' good will and ability to compete, and thus causes irreparable harm to Plaintiffs.

184.    If Defendants are not enjoined from engaging in such misconduct, Plaintiffs will lose the competitive advantage they spent considerable financial resources and time to obtain. Thus, the potential harm from Defendants' continuing actions is irreparable and cannot be adequately compensated in money damages alone.

185.    No adequate remedy at law exists for Plaintiffs to redress the harm caused by Defendants if they are allowed to continue their conduct unrestrained.

186.    The threatened injury to Plaintiffs substantially outweighs any potential harm the restraining order or injunction may cause Defendants.  While Plaintiffs would suffer significant harm in the absence of a restraining order and injunction, Defendants can still continue to earn a living, so long as Defendants compete fairly, return Plaintiffs' property, tangible and intangible, and refrain from using or disclosing Plaintiffs' trade secrets, intellectual property, and confidential and proprietary business information.

187.    The public interest favors protecting property rights and fair competition in the marketplace.  Certainly, the public interest is not offended by ordering Defendants to return Plaintiffs' property.  Further, the public interest is not offended by restraining and enjoining Defendants from using Plaintiffs' trade secrets, tradenames, trademarks, intellectual property, and confidential and proprietary information to the detriment of Plaintiffs, especially, when, as here,

PELT and BROWN are not foreclosed from pursuing whatever career path they may choose, *i.e.*, PELT's and BROWN's ability to earn a living lawfully would not be restrained.

188.     Therefore, Plaintiffs are entitled to injunctive relief, including the entry of a temporary restraining order, a preliminary injunction, and a permanent injunction.

## SIXTEENTH CLAIM
## <u>DECLARATORY RELIEF</u>

189.     Plaintiffs re-allege and incorporate all allegations set forth above.

190.     An actual, justiciable controversy exists between Plaintiffs and Defendants that is related to the ownership of UEN CORP and the ownership of certain intellectual property being used by UEN LLC.  Plaintiffs seek a determination of the rights, status, or other legal relations between the parties related to the assets, earning, liabilities, ownership, and other rights of the parties in connection with such matters as set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment in their favor and against Defendants as follows:

1)  That they be awarded actual, compensatory, statutory, nominal, incidental, liquidated, and consequential damages against Defendants;

2)  That they be awarded punitive damages;

3)  That they be awarded a temporary restraining order, a preliminary injunction, and a permanent injunction;

4)  That all profits and gains improperly obtained by Defendants be disgorged and awarded as damages to Plaintiffs;

5)  That they be granted declaratory relief;

6)  That they be awarded their attorneys' fees and costs incurred; and

7)  Such other relief as the Court deems just and proper.

Plaintiffs respectfully request that judgment be entered in their favor and against

Defendants.  Plaintiffs demand trial by jury upon all issues triable to a jury.


Respectfully submitted,

_____

RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS, P.C.
Peter W. Brolick, OBA #17781
Kristopher E. Koepsel, OBA #19147
Donald M. Bingham, OBA #794
502 West 6th Street
Tulsa, OK  74101
Telephone: (918) 587-3161
Fax: (918) 587-9708

ATTORNEYS FOR PLAINTIFFS
JURY TRIAL DEMANDED
ATTORNEYS' LIEN CLAIMED